UNITED STATES *v.* SEMON BACHE & Co.

No. 4475.—Invoices dated Birmingham, England, October 3, March 21, 1935.
Certified October 4, March 22, 1935.
Entered at New York October 18, April 5, 1935.
Entry Nos. 745291, 809091.

Second Division, Appellate Term

(Decision on remand from United States Court of Customs and Patent Appeals;
December 14, 1938)

*Joseph R. Jackson,* Assistant Attorney General (*Daniel I. Auster* and *Samuel D. Spector,* special attorneys), for the appellant.
*Jerome G. Clifford* for the appellees.

Before TILSON, KINCHELOE, and DALLINGER, Judges; TILSON, J., concurring

KINCHELOE, Judge: These appeals to reappraisement were decided by Judge Sullivan as sitting judge on October 5, 1936 (Reap. Dec. 3951). Judge Sullivan rendered a judgment holding that the entered values were the correct foreign values and the proper dutiable values. An appeal was then taken from this decision to this division by the attorney for the Government and later this division rendered a decision and judgment sustaining the judgment of Judge Sullivan (Reap. Dec. 4039). Thereafter the Government took an appeal to the Court of Customs and Patent Appeals and later the said court reversed the judgment of this division and remanded same for reconsideration of the issues on the record as made and in accordance with the views therein expressed (25 C. C. P. A. 387, T. D. 49466).

These reappraisements involve the dutiable value of certain gauge glasses known as the Eureka and Hercules qualities, purchased by the importers from Joseph Tomey & Sons, Ltd., of Birmingham, England, and imported into this country in April and October 1935, in two shipments. In red ink on the invoice in reappraisement 111688–A appears the following notation by the appraiser:

App. at Foreign Market unit value per doz. pieces less 50% discount less 2½% cash discount (less 1 pence per dozen cost of fusing ends on Eureka only) F. O. B. Liverpool Incl. case and packing.

In reappraisement 112228–A, on the invoice in red ink, is the following notation:

Appraised at Home Market list prices less 50% discount less cash discount of 2½% for cash less 1 pence per doz. for fuseing ends of Eureka glasses only F. O. B. PKd.

The attorneys for both parties conceded that the foreign-market values were the correct dutiable values and the *per se* prices were not in question. So the sole issue we had to decide was the amount of discounts applicable, and what constituted a wholesale quantity of each quality. Judge Sullivan held in his opinion the weight of evidence established that the usual wholesale quantity of the Eureka quality of gauge glasses is 1,000 feet or more, and of the Hercules quality, 500 feet or more; that the discount applicable to the sales of wholesale quantities of the Eureka quality gauge glass were 80 per centum from the list price, with the further discount of 2½ per centum for monthly payments; that the discounts applicable to the sales of wholesale quantities of Hercules gauge glass were 75 per centum and 10 per centum from the list price, with the further discount of 2½ per centum for monthly payments; that the *per se* prices are those stated on the invoices; that the foreign-market value of these gauge glasses is the dutiable value thereof; that the export value is the same as the foreign value and is not higher; and that the entered value is the foreign-market value of the Eureka and Hercules gauge glasses in question.

During the trial of this case the attorney for the appellees introduced as a witness Isidore Sobel, who testified in substance that he was vice president of the appellee concern, being connected with it for thirty-eight years, and vice president since 1912; that his duties included purchase and sale of merchandise for over thirty years; that personally he had to do with the purchase of the instant merchandise, which consists of two varieties known as Eureka low-pressure glasses and Hercules high-pressure glasses; that appellees import them in different diameters and lengths, and that the basic pricelist varies with the diameter of the glass and not with the length of the glass; that the range of diameters of both qualities runs all the way from ¼ to ⅜ up to 1½ inches in diameter, and in lengths from 3 inches to 84 inches; that the invoice prices of both are the prices he paid for them, and that said prices still obtain. He explained how he arrived at the price of Eureka quality as follows:

—A. Our invoices, the unit price is based on so much per dozen feet less the three 10 discounts. Abroad they have a printed list price on which they allow certain specific discounts. It is quite annoying to be obliged to figure the list price less the discounts. The method that we have adopted for invoicing or, rather, the factory has adopted, is much simpler. They figure out the price per dozen feet, less the three 10's instead of using the list price; but the net result, 80 per cent off the foreign list price, is equivalent exactly to the prices indicated on our invoices.

He stated that 80 per centum discount is allowed in the home market when purchases were made in wholesale quantities; that he is familiar with the manufacture of Eureka and Hercules glasses

and *has seen them manufactured;* that the characters of glasses of the instant importation and the characters sold in England are of the same value and character; that he is familiar with the market values of both Eureka and Hercules qualities in England and has been for about thirty-eight years; that he has placed *thousands* of orders for gauge glasses during that time; that he obtains quotations from abroad, not only from the manufacturer of the instant merchandise, but other shippers; that he obtains a knowledge of market value by *seeing records* in England, having conversations with heads of concerns over there; that he receives *certified extracts* of records right along; that he has *records* of *invoices* of gauge glasses for the home market consumption; that the prices for the Eureka and Hercules qualities of gauge glasses in the home market are not higher than the prices paid for the instant importations; and that the prices paid for the instant merchandise have been in effect for a period of six years.

At this point in the trial the attorney for the appellees offered one affidavit from the shipper of the Eureka glasses, which was filed as Collective Exhibit 1. This affidavit was executed by Joseph L. Tomey, managing director of Joseph Tomey & Sons, Ltd., of Birmingham, England, together with a *transcript of records, sales,* etc., of the Eureka quality.

On cross-examination by the attorney for appellant the witness, Sobel, testified in substance that the instant merchandise is first standard grade and not second; that he gets 80 per centum discount on Eureka quality because that is the wholesale market price of the manufacturer both at home and abroad to all wholesale buyers who purchase in quantities of 1,000 feet or more; that he was allowed 75 per centum discount and 10 per centum from the list price, with a further discount of 2½ per centum for monthly payments on purchases of Hercules glass in quantities of 500 feet or more; and that this is the wholesale market price of the manufacturer both at home and abroad to all wholesale buyers of the Hercules glass. The witness was then questioned as to the record of sales attached to said Collective Exhibit 1, which were under the heading of classes A, B, C, and D. He testified that A means small user, B refers to retailer, C to wholesaler, and D means large consumer, which might be a railroad company, a wholesaler, or a jobber; that the purchaser would have to be a wholesaler to come under class D; that in order to get the discounts allowed him in each of the qualities of the instant importation, purchaser would have to be a C or D buyer, but if an A or B buyer bought the quantities that the C or D buyer purchased, he would get the *same discount;* that the reason for the discounts allowed in each of these importations is not that the buyer buys extremely large quan-

tities, but simply that the buyer buys in wholesale quantities, and that the same price would be effective for *anybody* who would buy in wholesale quantities; that if the small user ordinarily termed in this record of sales as buyer A, bought in wholesale quantities either quality of glass of the instant merchandise, he would receive the *wholesale discount;* that the appellee is a very large wholesaler and buys in quantities equal to class D, but that is not the reason he gets the discounts. It is because he buys as much as the minimum wholesale quantity or more. If he bought less than the wholesale quantity of either quality of merchandise he would *not* get the wholesale price. On redirect examination witness stated that the wholesale quantity of Eureka gauge glasses is 1,000 feet or more, and that the wholesale quantity of Hercules glasses is 500 feet or more. On recross-examination he stated that he knows the usual wholesale quantity of both qualities of the instant merchandise by *being over in Europe,* having *looked at some of the records,* having received *certified* invoice copies of said glasses from the manufacturer, and from having *conversations* with the directors of the manufacturing company.

The said Joseph L. Tomey, in his affidavit, which is a part of said Collective Exhibit 1, testified in substance that the invoice prices to appellees for the Eureka quality, less discounts thereon noted, were the *actual* prices paid to his company by said appellees; that the net prices are equivalent to 80 per centum from the standard list prices of the manufacturer, and that the prevailing market prices of said quality in England for home consumption, when sold in the usual wholesale quantities and in the ordinary course of trade, were *no higher,* and that his company for ten years has freely offered the Eureka quality gauge glasses for sale to *all* purchasers of 1,000 feet or more at the price equal to the invoice price, less discounts thereon noted; and that the allowance of the wholesale discount depends *wholly* upon the purchase of 1,000 feet or more, without regard to the diameter of the glass, and without regard to the classification of the purchaser.

Attorney for the appellees also offered another affidavit of the said Joseph L. Tomey, together with a *transcript* of records of sales of the Hercules quality which was ordered filed and marked Collective Exhibit 2. The said Tomey, in this affidavit, states in substance that his company sells the Hercules quality gauge glasses for consumption in the home market and for export throughout the world; that for more than *five* years his company has freely offered for sale and now freely offers for sale said Hercules quality gauge glasses in England to all purchasers in the ordinary course of trade and in the usual wholesale quantities of 500 feet or more; and has been and is ready and willing to sell to any and all purchasers, whether *small users, consumers, retailers* or *wholesalers, large* users for export, Hercules quality gauge glasses identical to those shipped to the appellees, covered by

the invoices in the instant case, at prices equivalent to those granted to said appellees in quantities of *500* feet or more. The affidavit also states that his company cannot and does not extend to small users, consumers, or retailers, or purchasers of less than 500 feet, the same rates of discount which are given to purchasers of quantities of 500 feet or more, because of the extra cost of handling small quantities. The attorney for appellees then rested.

Thereafter the attorney for the appellant filed, as Collective Exhibit 3, a report dated January 17, 1934, signed by Ronald N. Marquis, consisting of 5 pages and exhibits containing certain invoices and pricelists of the said Joseph Tomey & Sons, Ltd. He gives the discounts on Eureka as 10 per centum, 10 per centum, and 10 per centum, and on Hercules, as 75 per centum and 10 per centum, and states that these discounts have been in effect for the past three years. He states "the Eureka gauge glasses are usually sold in the home market at a per pound price which is equal to approximately 82 per centum off the list price." He then gives prices indicating that these gauge glasses are slightly cheaper in the home market than they are for export to the United States. As to the Hercules quality glasses he states: "Invoiced to the United States at list prices less a discount of 75%/10%. They are invoiced in the home market at net prices which are equivalent to a discount of 83% off the list price." He states, under the heading of discounts: "From my inspection of the manufacturer's records, his estimate seemed substantially right." As to *the usual wholesale quantity* of the home market he states that "it is from 4 to 5 cwt. on up when sold by weight, and from 12 dozen upwards when sold by dozens" and continues, "The status of the buyer with the manufacturer, together with the quantity of merchandise purchased, determines the price to be paid. The manufacturer has no definite quantity specified which must be purchased to get any particular price. It is usually a case of bargaining between the purchaser and the seller."

The attorney for the appellant also filed a special agent's report of December 7, 1934, marked as Exhibit 4, consisting of two pages and signed by "Chas. R. Clark, Asst. Treasury Attache." This exhibit is merely in regard to analysis requested by the Commissioner of Customs which we do not deem of any probative value in this case. The attorney for the appellant also filed a report of May 9, 1935, of six pages signed by Martin H. Rawlyns with Exhibits A and B, consisting of sales of Eureka and Hercules gauge glasses and a pricelist issued by Joseph Tomey & Sons, Ltd., and marked "Collective Exhibit 5." Attached to this are exhibits which appear to be the same lists of sales as are part of Collective Exhibits 1 and 2. Attorney for the appellant also filed a report of March 16, 1936, of 2 pages signed by "Chas. R. Clark, Acting Treasury Attache" marked "Exhibit 6."

This report merely has reference to a prior decision of this court on similar merchandise, but in our judgment has no probative value so far as this case is concerned.

After thoroughly considering this entire record, including the oral evidence and Collective Exhibit 1, Collective Exhibit 2, Collective Exhibit 3, Exhibit 4, Collective Exhibit 5, and Exhibit 6, we held that the appellees had established by great weight of evidence that the entered values of both the Eureka and Hercules glasses were the correct dutiable values. We were very much impressed with the evidence of the witness Sobel and with the affidavits contained in Collective Exhibits 1 and 2, executed by the said Joseph L. Tomey.

The appellate court reversed our judgment and remanded same to this division apparently for the reasons, as stated by it, that this court erred in not taking into account the sales to retailers for resale in the determination of the usual wholesale quantity in the ordinary course of trade; that there is no evidence of record to establish that the sales to retailers, for resale, were not made in the ordinary course of trade; nor was there any evidence of record to establish that such sales, and sales to other purchasers, in quantities of less than 1,000 feet of Eureka quality and 500 feet of Hercules quality, were not in wholesale quantities except mere assertions by the witnesses Sobel and Tomey to that effect and that the assertions by these two witnesses were mere conclusions based upon facts appearing of record and therefore should not be given any weight by this court in determining the usual wholesale quantity of the merchandise in question in the ordinary course of trade in England.

The Court of Customs and Patent Appeals in its decision said:

In its decision, the appellate division of the Customs Court stated that all sales of less than 1,000 feet of the Eureka quality gauge glasses, and less than 500 feet of the Hercules quality, were "not in *usual wholesale quantities*," and, therefore, should not be included in determining the *usual* wholesale quantities. [Italics quoted.] The court further stated that it was thoroughly familiar with the pronouncements of this court in *United States* v. *Livingston & Southard, Inc.,* 23 C. C. P. A. (Customs) 214, T. D. 48060, and other cases, that the statutory "language 'in the usual wholesale quantities' was intended to refer to a *major portion* of the sales or offers for sale *in wholesale quantities, etc.,*" but that it did not believe that the rule stated in the decisions in those cases had any application to the issues in this case. [Italics quoted.]

In determining *usual* wholesale quantities, *all* wholesale quantities of the merchandise involved should, of course, be taken into account, and what the appellate division undoubtedly intended to say was that sales of less than 1,000 feet of the Eureka quality and less than 500 feet of the Hercules quality were *not* sales in *wholesale quantities*, and, therefore, should not be considered in determining the *usual* wholesale quantities.

What this division did say, is:

If it be a fact, and the great weight of evidence in our judgment substantiates it, that 1,000 feet or more of the Eureka quality and 500 feet or more of the

Hercules quality were the usual wholesale quantities at the time of the exportation of the instant merchandise at which same or similar merchandise was freely offered for sale to *all* purchasers in England and in the ordinary course of trade, then the records of sale of each quality offered in evidence in this case in *less quantities* are, in our judgment, of no probative value because they were not in *usual wholesale quantities.* * * *

We made that statement because of the fact that both the witnesses Sobel and Tomey testified unequivocally that sales of less than 1,000 feet of the Eureka quality and 500 feet of the Hercules quality were less than wholesale quantities at the time of the exportation of the instant merchandise giving their reasons for same, and this evidence is not contradicted in this entire record except by a statement of Special Agent Marquis in Collective Exhibit 3, in which he stated the usual wholesale quantity of this merchandise in the home market is from 4 to 5 cwt. when sold by weight and from 12 dozen upwards when sold by dozens. This is a mere statement of his, unsupported so far as this record is concerned, and based upon nothing except his own opinion.

It is true that we cited in our opinion the case of *United States* v. *Livingston & Southard, Inc.*, 23 C. C. P. A. 214, T. D. 48060, when perhaps we should have cited the case of *United States* v. *Minkus*, 21 C. C. P. A. 382, T. D. 46912, which held in substance that the language "in the usual wholesale quantities" was intended by Congress to refer to a major portion of the sales or offers for sale in wholesale quantities. However, this proposition was enlarged upon by *United States* v. *Livingston & Southard, supra*. Also in said decision, the court further held in substance that in section 402 (c) of the Tariff Act of 1930 all unrestricted offers for sale, in the principal markets of the country from which the merchandise is exported, whether for home consumption or for export to countries other than the United States, should be considered in arriving at the foreign value of the merchandise. But we are still of the opinion that neither the *Minkus* nor *Livingston & Southard* cases, *supra*, has any bearing upon this case in view of the record made herein and for reasons hereinafter discussed.

The witnesses Tomey and Sobel both testified that the price did not fluctuate or depend upon the quantity purchased as long as a minimum wholesale quantity was involved. In other words, regardless of how much was purchased in excess of a wholesale quantity, the price remained the same. Therefore, the decisions in the *Minkus* and the *Livingston & Southard* cases, *supra*, have no application in this case because in those cases the prices changed because of a range of various wholesale quantities and the court held that the majority of sales in wholesale quantities both for home consumption and for export to countries other than the United States was the criterion in determining the usual wholesale quantity.

The court further said:

In the instant case, the Second Division of the United States Customs Court held that sales to retailers, for resale, were *not* sales in wholesale quantities, and did *not* take such sales into account in its determination of the usual wholesale quantities in the ordinary course of trade.

This is not a correct statement. We did not hold in our opinion nor do we hold here that there may not be transactions arising where sales to retailers for resale, or even to consumers, may not be considered in arriving at what constitutes a wholesale quantity. But primarily they must be sales of at least a *wholesale* quantity in the ordinary course of trade and without restriction. As well said in the case of *United States* v. *Richard & Co.*, 15 Ct. Cust. Appls. 143, T. D. 42216, "the law is not concerned with the *persons* who buy, but the *manner* in which they buy." [Italics ours.]

We did take into account in our decision in determining a wholesale quantity in the ordinary course of trade, sales to retailers for resale of such merchandise, but in view of the fact that the evidence in this case clearly shows that the sales of such merchandise to retailers and consumers of less than 1,000 feet of the Eureka quality and 500 feet of the Hercules quality were not sales in a wholesale quantity, we held and still hold that such sales are not sales of a wholesale quantity. This reasoning was substantiated by the testimony of Tomey and Sobel, in our judgment two of the best qualified witnesses available, managing director of the exporter, with twenty years' experience as such, and the vice president of the importers, with thirty-eight years' experience, respectively, who repeatedly stated that, based upon their experience in *buying* and *selling* such merchandise, the wholesale quantity consists of at least 1,000 feet of the Eureka quality and 500 feet of the Hercules quality, and further testified that anyone, whether he be wholesaler, retailer, or consumer, could buy said merchandise at that price if bought in that quantity, and on the other hand that if wholesalers and other large users bought said merchandise in a quantity less than a wholesale quantity they would not receive as large a discount as if they bought in the said wholesale quantity. We invite *special* attention to the case of *G. W. Pleissner* v. *United States*, 16 Ct. Cust. Appls. 507, T. D. 43237, at pages 511 and 512, because of the fact they show that the evidence and conclusions of the appellate court are very similar to the evidence and our conclusion in this case, except the evidence in this case has much more probative value than in the *Pleissner* case, *supra*.

In its opinion the Court of Customs and Patent Appeals stated:

* * * we think it may be said that, *as a general proposition*, where goods are sold in the ordinary course of trade to retailers, for resale, the other essentials in the statutory definition of foreign value being present, such sales are sales in wholesale quantities, and should be considered together with other sales in wholesale quantities in "determining what are usual wholesale quantities." [Italics ours.]

The above rule as laid down by our appellate court, *as a general proposition*, might govern in some instances. However, the facts in each case must determine whether the general rule or the exception thereto applies. We think that the weight of evidence establishes that the exception to the general rule applies in this case, for the reason that the facts show that the other essentials in the statutory definition of foreign value are not present and therefore clearly distinguish this case from the adaptability of the general rule.

The appellate court also refers to its decision in the case of *Jenkins Bros.* v. *United States*, 25 C. C. P. A. 90, T. D. 49093. That case evidently was decided on the *record made therein*, and the record in that case was not incorporated in this case. We decided this case "* * * solely and alone upon the record as it is submitted to us." See *Pleissner* case, *supra*.

The appellate court further stated:

It clearly appears from the record, and there is no evidence to the contrary, that retailers and wholesalers, as well as all other purchasers, purchasing quantities of less than 1,000 feet of the Eureka quality gauge glasses and less than 500 feet of the Hercules quality, pay the manufacturer's list prices, less varying discounts, depending upon the quantities purchased, and that both qualities of gauge glasses are freely offered for sale in England to such purchasers, in such quantities, and at such prices.

In view of those facts, can it be said that those offers for sale, and sales made in accordance therewith, were not in the ordinary course of trade?

Even conceding they were made in the ordinary course of trade, they were not in *wholesale quantities* nor at any one price to all purchasers, for the reason that these small quantities are more or less a question of bargaining for a price and therefore were not at a uniform price, as stated in Special Agent Marquis' report, Exhibit 3, which states: "It is usually a case of bargaining between the purchaser and the seller," and this is further corroborated by the affidavits, collective Exhibits 1 and 2, of the said Tomey, who stated, "that my company can not extend to small users, consumers, and retailers or other purchasers of less than [1,000 feet or 500 feet] the same rates of discount which are given to purchasers of quantities of [1,000 feet or 500 feet] or more because of the extra costs to us of handling small quantities."

The court also said:

There is no evidence of record to establish that the sales to retailers, for resale, referred to in the testimony of the witnesses for appellee, were not made in the ordinary course of trade. Nor is there any evidence of record to establish that such sales, and sales to other purchasers in quantities less than 1,000 feet of the Eureka quality and 500 feet of the Hercules quality, were not in wholesale quantities, except *mere assertions* by the witnesses Sobel and Tomey to that effect. Inasmuch as those assertions were *mere conclusions based upon facts appearing of record*, they should have been given no weight by the courts below in determining the usual wholesale quantities of the merchandise in question in the ordinary course of trade in England. [Italics ours.]

To us this is the most startling statement of the whole opinion and it makes us wonder if the appellate court really did give the evidence in this case the consideration and careful study it really deserved.

The evidence upon which this court based its conclusions were not *"mere assertions"* of the witnesses Sobel and Tomey, but statements of facts made by these two witnesses under oath, and the testimony of these witnesses was not confined to "mere conclusions based upon facts appearing of record," but the witness Sobel unequivocally stated, as a fact within his knowledge, that a wholesale quantity did consist of 1,000 feet of the Eureka quality and 500 feet of the Hercules quality, respectively, and he was corroborated by the affidavits (Collective Exhibit 1 and Collective Exhibit 2) of the said Tomey. It should be especially noted that the affidavits of said Tomey are very similar, both in form and substance, to the affidavit executed by Willy Guenther in the *Pleissner* case, *supra.*

In the *Pleissner* case, *supra*, the court in its opinion stated in part as follows:

It therefore appears that there is no substantial evidence, and, in fact, no evidence at all, in contradiction of the statements of Pleissner and Guenther, heretofore quoted.

So we say in this case, it therefore appears that there is no substantial evidence, and in fact no evidence at all, in contradiction of the statements of Sobel and Tomey.

If the testimony of men with years of experience in buying and selling such merchandise all over the world, and said testimony being based upon *that experience*, and not "mere conclusions based upon facts appearing of record," is not to be given probative value, then we confess we do not know probative evidence when we hear or read it. Who are better qualified to give evidence as to what constitutes a wholesale quantity of such merchandise than these two witnesses? And this testimony is not contradicted except by a *mere conclusion*, as above set out, in the report of the Treasury representative in Exhibit 3. In other words if the *opinions* of witnesses, who testified they have had years of experience in buying and selling a commodity in the trade and commerce of the world, as to what constitutes a wholesale quantity of such merchandise, is not expert testimony and is of no probative value, then we also confess we do not know the value of expert testimony and why it is ever permitted in the courts of this country in any case.

If the method pursued by the attorney for the importer in this case, and the nature and extent of proof offered, is not the proper method or is insufficient to establish the *fact* that 1,000 feet of the Eureka quality and 500 feet of the Hercules quality, respectively, constitute a wholesale quantity, then we confess that we need enlightenment on the subject.

The last paragraph of section 501 of the Tariff Act of 1930 reads as follows:

The judge shall, after argument on the part of any of the interested parties requesting to be heard, render his decision in writing together with a statement of the reasons therefor and *of the facts on which the decision is based.* Such decision shall be final and conclusive upon all parties unless within thirty days from the date of the filing of the decision with the collector an application for its review shall be filed with or mailed to the United States Customs Court by the collector or other person authorized by the Secretary of the Treasury, and a copy of such application mailed to the consignee, or his agent or attorney, or filed by the consignee, or his agent or attorney, with the collector, by whom the same shall be forthwith forwarded to the United States Customs Court. Every such application shall be assigned by the court to a division of three judges, who shall consider the case upon the samples of the merchandise, if there be any, and the record made before the single judge, and, after hearing argument on the part of any of the interested parties requesting to be heard, shall affirm, reverse, or modify the decision of the single judge or remand the case to the single judge for further proceedings, and shall state its action in a written decision, to be forwarded to the collector, *setting forth the facts upon which the finding is based and the reasons therefor.* The decision of the United States Customs Court shall be final and conclusive upon all parties unless an appeal shall be taken by either party to the Court of Customs and Patent Appeals upon a *question or questions of law only* within the time and in the manner provided by section 198 of the Judicial Code, as amended. [Italics ours.]

The court further said:

It is not within the province of this court to make findings of fact in reappraisement cases. The jurisdiction of the court, in such cases, is limited to the review of judgments of the appellate division of the United States Customs Court on questions of law only.

We thoroughly agree that the court was right in this statement, as this is clearly and plainly set out in section 501, *supra.* Yet the court then further said:

We are of opinion that there is no *substantial evidence* of record to support the findings of the appellate division of the Customs Court. [Italics ours.]

Can anyone read this opinion and say that the court has not made findings of fact? If we understand this opinion, the court has made "findings of fact" all through same, a thing which Congress expressly forbade as shown in section 501, *supra.*

The appellate court has a perfect right to pass upon *all questions of law,* in all reappraisement proceedings, but this court claims and seriously contends that it has the exclusive right, as clearly given us by Congress, to pass upon *all findings of fact.* We say, with pardonable pride, that we feel this court is amply qualified to know and judge probative evidence in reappraisement cases and evidently Congress thought so when it enacted the above language, giving this court *exclusive* jurisdiction of findings of facts in all reappraisement cases.

As hereinbefore stated, section 501 of the Tariff Act of 1930 clearly limits the jurisdiction of the Court of Customs and Patent Appeals, in reappraisement cases, to the determination of questions of law only. Therefore, we feel that any conclusion reached by it through the determination of the weight to be given evidence, especially when such evidence is competent legal probative evidence of record, is not binding upon this court.

We further feel and fully realize that this court is bound by and must follow any *principle of law* as decided by said court; however, we do not feel that the conclusion reached in this case, in view of the record herein, is contrary to any principle of law as expressed by the Court of Customs and Patent Appeals.

After careful reconsideration of this entire record in the light of the opinion of our appellate court, and in view of the further fact that this court is the sole judge of facts and findings of facts in all reappraisement cases, as specifically provided by Congress in the Tariff Act of 1930, we cannot help but feel, with all due respect to our appellate court, that it reversed our decision upon a wrong premise and predicated this premise upon a state of facts, which, in our judgment, did not exist in the record.

Therefore, in view of the importance of this case, and in order that justice may be rendered to both appellees and appellant, we think it is our duty in the premises to reaffirm our original judgment, in order to give our appellate court another opportunity to review again not only the record of this case and our decision and judgment but its own.

We think the testimony of Sobel, considered with the affidavits of Tomey together with the transcripts of sales attached thereto, comprise substantial evidence of the facts that sales of less than 1,000 feet of the Eureka quality and 500 feet of the Hercules quality were not sales of a wholesale quantity.

We also think that the testimony of Sobel, considered with the affidavits of Tomey with transcripts of sales attached, comprise substantial evidence of the facts that 1,000 feet of the Eureka quality and 500 feet of the Hercules quality are the minimum wholesale quantities of this merchandise, and that the prices that were freely offered to all purchasers of such quantities, in the ordinary course of trade, either in the foreign market or for exportation to the United States, were the entered values.

We therefore find the following facts:

1. That the merchandise covered by these reappraisements consists of Eureka and Hercules qualities of gauge glasses.

2. That the foreign-market value of both of same is the correct dutiable value thereof.

3. That the export value is the same as the foreign value and is not higher.

4. That the wholesale quantity of the Eureka quality of gauge glass and the Hercules quality of gauge glass, in which such merchandise was freely offered for sale to all purchasers in the principal markets of England at the time of exportation of the instant merchandise and in the ordinary course of trade was 1,000 feet or more for the Eureka quality and 500 feet or more for the Hercules quality.

5. That the discount applicable to the sales of wholesale quantities of the Eureka gauge glass is 80 per centum from the list price, with the further discount of 2½ per centum for monthly payments.

6. That the discounts applicable to the sales of wholesale quantities of Hercules gauge glass are 75 per centum and 10 per centum from the list price, with a further discount of 2½ per centum for monthly payments.

7. That the *per se* prices are those stated on the invoice.

We hold, as a matter of law, that the correct dutiable values of the instant merchandise are the foreign-market values of both Eureka and Hercules gauge glasses in question, and that the judgment of the sitting judge in this case is hereby affirmed.

Judgment will be rendered accordingly.

### CONCURRING OPINION

TILSON, Judge: While fully concurring in the conclusion reached by my associates, I wish to express the following views which, I feel, not only support, but demand such conclusion:

In reversing the original judgment in this case and remanding the same to us for reconsideration of the issues on the record as made, the appellate court, among other things, said:

Considering the provisions of section 402 (c), supra, and the dictionary definitions of the terms "Wholesale" and "retail," we think it may be said that, as a general proposition, where goods are sold in the ordinary course of trade to retailers, for resale, *the other essentials in the statutory definition of foreign value being present*, such sales are sales in wholesale quantities, and should be considered together with other sales in wholesale quantities in "determining what are usual wholesale quantities." Jenkins Brothers v. United States, supra. [Italics ours.]

Further in its decision the appellate court stated:

There may be instances where sales by manufacturers to retailers, for resale, are not *"in the ordinary course of trade,"* within the purview of section 402 (c), supra. See United States v. A. W. Faber, Inc., 21 C. C. P. A. (Customs) 290, 293, T. D. 46819. *However we are not here confronted with such a situation.* [Italics ours.]

Again referring to the decision of the appellate court:

In the instant case, we are called upon to determine whether, as a matter of law, the holding the Second Division of the Customs Court that the sales of gauge

glasses in England by the manufacturers thereof to retailers, for resale were not sales in wholesale quantities in the ordinary course of trade, is supported by any substantial evidence of record. If it is, the judgment should be affirmed. If it is not, the judgment should be reversed.

In view of the mandate of the appellate court remanding this case for reconsideration of the issues on the record as made, counsel for the respective parties have not been asked for additional briefs, but we have proceeded to a reconsideration of the issues on the record as made, without the addition thereto of a single word.

From a careful reading of the appellate court's decision it is quite clear that our decision was reversed for the sole reason that we did not find and hold that certain sales to retailers, for resale, were sales in wholesale quantities, and then consider said sales together with other sales in wholesale quantities in "determining what are usual wholesale quantities."

Therefore, in reconsidering this case on the record as made, we should first consider and determine whether or not we are permitted, under the law and the decisions of the appellate court, to consider the sales above referred to together with other sales in wholesale quantities in determining what are usual wholesale quantities. If, under the law, we are not permitted to consider such sales, then it would appear that our original judgment should have been affirmed. If, under the law, we are permitted and should have considered such sales, then it would appear that our judgment was correctly reversed. The sales particularly referred to above were in the form of transcripts of sales made by the exporter, attached to Collective Exhibits 1 and 2. There is also a similar transcript of sales attached to Collective Exhibit 5.

In holding that sales in the ordinary course of trade to retailers, for resale, are sales in wholesale quantities, and should be considered together with other sales in wholesale quantities in determining what are usual wholesale quantities, the appellate court particularly limited such *sales* to those *where the other essentials in the statutory definition of foreign value were present.* What are "the other essentials in the statutory definition of foreign value" which must be present before any sales can become sales in wholesale quantities to be considered together with other sales in wholesale quantities in determining what are usual wholesale quantities? Without attempting to define all the "other essentials in the statutory definition of foreign value" before any sale becomes a wholesale quantity, suffice it to say here that one of those essentials is that the merchandise must be *freely offered to all purchasers.* Where there is a restriction that the merchandise must be resold at a certain price, or where a certain quantity must be purchased in order to get that price, this would be a restricted sale and a restricted market, and, therefore, the merchandise would not be

*freely offered to all purchasers. Goodyear Tire & Rubber Co.* v. *United States,* 11 Ct. Cust. Appls. 351, T. D. 39158.

If the status of the buyer with the seller determines the price to be paid, or if it is a case of bargaining between the purchaser and seller in arriving at the price, it cannot be said that the merchandise is *freely offered to all purchasers.* Where the status of the buyer with the seller determines the price to be paid and the price is arrived at by a method of bargaining between the purchaser and seller, such sales cannot be considered in determining what constitutes a wholesale quantity of the merchandise. In such a case one of the essentials in the statutory definition of foreign value, instead of being present, is notably absent. *United States* v. *International Forwarding Co.,* 13 Ct. Cust. Appls. 579, T. D. 41436.

Where merchandise is offered for sale by means of a pricelist and there is evidence, in the form of lists of sales, showing that the pricelist is not followed in making sales of the merchandise but that it is sold in the majority of instances at prices different from those shown in the pricelist, the pricelist becomes of little if any value and the evidence of the price at which the merchandise was actually sold must be accepted as the value of, or the price at which, the merchandise was sold. The statute is not satisfied where it is only shown that goods are sold in the ordinary course of trade to retailers, for resale, but in addition, as stated by the appellate court, *the other essentials in the statutory definition of foreign value must be present,* and one of those essentials is that the *merchandise must be freely offered for sale to all purchasers.*

In conformity with the mandate of the appellate court in this case, I have reexamined and reconsidered the transcripts of sales herein-above referred to and find indisputable evidence therein that these sales were made by bargaining between the seller and the purchaser. As an illustration, the sale of Hercules gauge glasses under date of September 27 on page 1 of Collective Exhibit 2, where a sale of 4 feet is shown at 2 shillings net should be considered, and likewise on page 12 of said exhibit under date of October 5, where the sale of 4 feet of said gauge glasses is shown at a price of 1 shilling, 3 pence, less a discount of 65 per centum. Again on page 16 of said exhibit there is shown a sale of 4 feet of said gauge glasses at a price of only 6 pence, less a discount of 80 per centum.

On page 2 of said exhibit is shown a sale of 14 feet of said gauge glasses at 6 shillings, 7 pence, less 20 per centum discount, and on page 8 of said exhibit is shown a sale of the same amount at 5 shillings, 8 pence, less a discount of 50 per centum. On page 1 of said exhibit is shown a sale of 11 feet 6 inches of said gauge glasses at 1 pound, 4 shillings, net, while on page 8 is shown a sale of the exact quantity at 3 shillings, 6 pence, less a discount of 50 per centum, and on page 13 of

said exhibit is shown a sale of 11 feet 4½ inches at only 2 shillings, 5 pence, less a discount of 70 per centum. On page 1 of said exhibit is shown a sale of 1 foot, 6 inches, at 2 shillings, net; on page 6 is shown a sale of the exact amount at 9 shillings, less 40 per centum, another sale of the same amount at 2 shillings, less 40 per centum. On page 1 of said report is shown a sale of 17 feet, 9 inches, at 10 shillings, 6 pence, net, and on page 8 is shown two sales of the exact same amount, one at 7 shillings, 3 pence, less 50 per centum, and the other at 5 shillings, 3 pence, less 50 per centum. It is worthy of note that one of these sales is at 10 shillings, 6 pence, net, and another at 5 shillings, 3 pence, less 50 per centum. On page 2 is shown a sale of 44 feet, 6 inches, at 1 pound, 9 shillings, 4 pence, less 20 per centum, and on page 3 a sale of 44 feet at 19 shillings, 3 pence, less 25 per centum discount, another sale of 48 feet at 1 pound, 8 shillings, 11 pence, less 25 per centum discount, on page 8 a sale of 48 feet at 13 shillings, 3 pence, less 50 per centum discount, and on page 16 a sale of 48 feet at 6 shillings, less 80 per centum discount. On page 16 is shown a sale of 102 feet at 1 pound, less 80 per centum, and another sale of 201 feet at 1 pound, 12 shillings, less 80 per centum. On page 15 is shown a sale of 210 feet at 3 pounds, less 80 per centum. On page 13 is shown a sale of 210 feet at 1 pound, 10 shillings, 11 pence, less 70 per centum. On page 11 is shown two sales of 204 feet each, one at 2 pounds, 7 shillings, 7 pence, less 60 per centum, and the other at 7 pounds, 10 shillings, less 60 per centum, and on page 16 is shown another sale of 240 feet at 1 pound, 7 shillings, less 80 per centum.

The above examples have been picked at random and without selection from the transcript of sales attached to Collective Exhibit 1, and represent but a few of the examples of the prices arrived at by bargaining. An examination and comparison of the other hundreds of items shown on said exhibit would only serve to prolong this decision. An examination of the entire transcript shows that the examples set out above have been fairly selected and is sufficient to establish that the sale of all the merchandise shown on said transcript was arrived at by the method of bargaining between the seller and the buyer.

An examination and comparison of the sales in the transcript attached to Collective Exhibit 2, covering Eureka gauge glasses, shows a result quite similar to the examples hereinbefore detailed with reference to Hercules gauge glasses. The transcripts of sales of Hercules and Eureka gauge glasses attached to Collective Exhibit 5, show sales of the merchandise quite in line with the sales shown in the transcript of sales attached to Collective Exhibits 1 and 2. An examination and comparison of the sales in these two transcripts also shows a result quite similar to the examples hereinbefore detailed with reference to the transcript attached to Collective Exhibit 1.

It therefore appears that the large number of sales, hereinbefore referred to, all based upon the status of the buyer with the manufacturer, the quantity of merchandise purchased, and after bargaining between the purchaser and seller, is the very best evidence "that the sales to retailers, for resale, referred to in the testimony of the witnesses for appellee, were not made in the ordinary course of trade," and were not free offers for sale to any one.

As further evidence of the fact that the status of the buyer with the seller, and the quantity of merchandise purchased, controls the prices paid therefor, and that the prices are arrived at by bargaining between the purchaser and seller, we quote the following from Collective Exhibit 3:

> The status of the buyer with the manufacturer, together with the quantity of merchandise purchased, determines the price to be paid.
>
> The manufacturer has no definite quantity specified which must be purchased to get any particular price. It is usually a case of bargaining between the purchaser and seller. [Italics ours.]

The evidence above set out completely refutes any holding that retailers and wholesalers, as well as all other purchasers, who purchase in quantities of less than 1,000 feet of the Eureka quality gauge glasses, and less than 500 feet of the Hercules quality gauge glasses, pay the manufacturer's list price, less varying discounts, depending upon the quantities purchased. If we should accept the pricelist in evidence at its face value without considering any other evidence bearing on the price of the merchandise, it might be said that both qualities of gauge glasses are freely offered for sale in England to retailers and wholesalers, as well as all other purchasers in specified quantities and at set prices. However, under the law, it is our duty to weigh all the evidence before us and then determine what weight should be given thereto.

Having done this, we are inclined to give more weight to the list of actual sales before us than to the pricelist, particularly when the evidence shows that few, if any, sales were ever made in accordance therewith either as to prices or quantities, and that a large number, if not all, of the sales consummated were at prices and in quantities entirely different from those shown in said pricelist. We feel, and so hold, that a pricelist, in accordance with which few, if any, sales are ever made, either as to quantities or prices, is not entitled to the same consideration and weight as a large number of actual sales, few, if any, of which correspond with the pricelist, either as to prices or quantities.

It therefore clearly appears from the record before us that retailers and wholesalers, as well as all other purchasers, purchasing in quantities of less than 1,000 feet of Eureka quality gauge glasses and less than 500 feet of the Hercules quality gauge glasses, do not pay the manu-

facturer's list price less varying discounts, depending upon the quantities purchased, and that both qualities of said gauge glasses are not sold in England to such purchasers, in such quantities, and at such prices. This holding is amply supported by the weight of the evidence hereinbefore set out, as well as by all the evidence in the record before us, which we have not failed to consider and weigh.

Since the sales of this merchandise, hereinbefore referred to, are not the market values or the prices at the time of exportation of such merchandise to the United States, at which such or similar merchandise is *freely offered* for sale to all purchasers in the principal markets of the country from which exported, such sales can have no weight as evidence in determining what constitutes a usual wholesale quantity of the merchandise. In order to be used for such purpose it would have to be shown that such sales are the market values or the prices at the time of exportation of such merchandise to the United States, at which such or similar merchandise was *freely offered* for sale to all purchasers in the principal markets of England. This was the holding of the appellate court in the case of *Goldmark* v. *United States*, 22 C. C. P. A. 358, T. D. 47378, from which we quote the following:

The price to be accepted as an element of foreign value must be a price at which such or similar mechandise, at the time of exportation of the merchandise involved, is freely offered for sale to all purchasers in the principal markets in England in the usual wholesale quantities and in the ordinary course of trade.

On the same point, we quote the following from the case of *United States* v. *Malhame*, 19 C. C. P. A. 164, T. D. 45276:

The court below is quite correct in the statement that as a matter of law a single sale might establish an export value. But, in order to do so, it must appear from proof that such a sale accords with a free offering at that price to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States * * *.

In the instant case the prices shown in the list of sales attached to the two affidavits and the special agent's report are not prices at which such or similar merchandise, at the time of exportation of the merchandise involved, was freely offered for sale to all purchasers in the principal markets of England, and therefore such prices cannot be accepted as an element of the foreign value of the merchandise. Neither can such pricelists be accepted as having any value in destroying the weight to be given to other evidence in this record. The pricelist is completely disproved and discredited by other evidence in the record before us.

It will thus be seen that far from contradicting any statements made in the affidavits and in the testimony of Mr. Sobel as to what constitute wholesale quantities, and thereby making said statements mere conclusions of the witnesses, which can have no weight with the court in

determining what is a wholesale quantity, the lists of sales attached to said affidavits and the special agent's report are in complete accord with, and fully support said statements, that a wholesale quantity of Eureka quality gauge glasses is 1,000 feet or more, and that 500 feet or more of Hercules quality gauge glasses is a wholesale quantity.

Certainly the appellate court did not hold, nor do we think it intended to hold, in the *Jenkins* case, *supra*, that a statement in an affidavit that 1,000 feet was a wholesale quantity, supported by 100 invoices attached showing 100 sales of 1,000 feet each, can have no weight as a statement of fact, but becomes merely a conclusion of the witness which can have no weight with the court in determining what is a wholesale quantity. In such a case such a statement would stand as a statement of fact, supported by 100 invoices of actual sales, and would not become a mere conclusion of the witness simply because it was supported by evidence of 100 actual sales. On the other hand a statement in an affidavit, standing alone and without the supporting sales, must be regarded as some substantial evidence of the fact, particularly where it is shown that the fact is within the affiant's knowledge, and his qualifications are unquestionable.

Under no circumstances can it be held that the list of sales in this case in any way contradicts the statements in the affidavits, because the evidence shows that in making all of these sales the status of the buyer with the manufacturer, together with the quantities of merchandise purchased determines the price to be paid, and it is usually a case of bargaining between the purchaser and seller. If it were shown that all of these sales were restricted sales, then certainly they could not be used to discredit the statement of the witness, and render the same nothing more than a mere conclusion of the witness. It is my conclusion that the lists of sales in this case are equally as valueless to discredit the statement of the witness as if each of them were proven to be a restricted sale.

Sales of merchandise made in accordance with the statute are valuable evidence in establishing proper dutiable value of merchandise. Sales of merchandise not made in accordance with the statute, that is sales where all the essentials in the statutory definition of foreign value are not present, neither prove nor disprove anything. Sales of merchandise made in accordance with the statute are valuable in establishing a wholesale quantity of merchandise. Sales of merchandise not made in accordance with the statute neither prove nor disprove what is a wholesale quantity. Neither can such latter sales be used either to support or in any way disprove, contradict, discredit or impeach the statement of any thoroughly competent and highly qualified witness, when the evidence shows that such statements are well within the knowledge of such witness.

I am not arguing, and do not wish to be understood as claiming, that sales by a manufacturer or wholesaler to a retailer, for resale,. may not be considered in determining the usual wholesale quantity of merchandise, but I do insist, and in this I feel I am fully supported by the decision of the appellate court remanding this case, that before such sales may be considered for said purpose, they must be shown to be sales made in accordance with the statute. In other words, they must be sales wherein "the other essentials in the statutory definition of foreign value being (are) present." [Parentheses ours.]

The remand in this case was for a reconsideration of the issues on the record as made and in accordance with the views therein expressed. This is far from a remand for a determination of a wholesale quantity based upon the sales in the record. One of the views expressed in the remand was that "the other essentials in the statutory definition of foreign value" must be present before this or any other court could consider sales in the ordinary course of trade to retailers, for resale, in determining what are usual wholesale quantities.

Had all these sales in this case been made in a restricted market, and we overlooked that fact, and used said sales in finding a usual wholesale quantity, certain it is that, when this fact was pointed out on appeal, our decision would be promptly and correctly reversed. Likewise in this case if we should use these sales, not made in accordance with the statute, in finding a usual wholesale quantity, our decision would be erroneous. Accordingly, in considering all these sales, in compliance with the remand, it is found that the same neither discredit nor disprove the statements of the witnesses as to what is a wholesale quantity, nor do they establish what is a wholesale quantity, nor do they lend any support to the contention of the appellant that a wholesale quantity is 12 dozen feet.

Proceeding further to a consideration of what is the foreign-market value of this merchandise, which involves first the determination of what constitutes a wholesale quantity, we must determine whether there is any competent evidence in the record as made, aside from the three lists of sales and the pricelist hereinbefore disposed of, upon which to base a finding of a wholesale quantity.

Taking first the affidavit of Joseph L. Tomey, it is found that he is the managing director of the exporting company, having served in that capacity for twenty years; that as such managing director, he supervises the general business of the company and participates in the formulation of and directs the sales policy of said company; that his company sells Eureka quality gauge glasses with cut ends and with fused ends for consumption in the home market in both retail and wholesale quantities and for export throughout the world; that his company has for more than five years freely offered for sale and now freely offers for sale Eureka quality gauge glasses in England to all

purchasers in the ordinary course of trade and in wholesale quantities of 1,000 feet or more, and has been and is ready and willing to sell to any and all purchasers Eureka quality gauge glasses identical to those shipped to the appellee herein, in quantities of 1,000 feet or more, at prices equivalent to those granted to the appellee herein.

With reference to the Hercules quality gauge glasses this same witness stated in substance that his company sells Hercules quality gauge glasses for consumption in the home market and for export throughout the world; that his company has for more than five years freely offered for sale and now freely offers for sale Hercules quality gauge glasses in England to all purchasers in the ordinary course of trade, and in wholesale quantities of 500 feet or more and has been and is ready and willing to sell to any and all purchasers Hercules quality gauge glasses identical to those shipped to the appellee herein at prices equivalent to those granted to the appellee herein in quantities of 500 feet or more.

We also have the testimony of Isidore Sobel, which in every material detail supports the evidence given by Mr. Tomey. Mr. Sobel is the vice president of the importer herein; has been connected with the firm for thirty-eight years, and has been vice president for twenty-four years; his duties include the purchase and sale of merchandise, for over thirty years, including gauge glass tubes; he personally had to do with the purchase of the instant merchandise, and swears that the invoice prices of both these qualities are the prices he paid for the same, and that said prices still obtain. This witness stated that he received 80 per centum discount on Eureka quality because that is the wholesale market price of the manufacturer both at home and abroad to all purchasers of this merchandise in quantities of 1,000 feet or more, and that he was allowed 75 per centum and 10 per centum discount from the list price when he purchased Hercules in quantities of 500 feet or more, and that this is the wholesale market price of the manufacturer both at home and abroad. This witness also stated that 1,000 feet or more of Eureka quality gauge glasses and 500 feet or more of Hercules quality gauge glasses constituted wholesale quantities thereof. His qualifications for making such statements were ample and he was not shaken on cross-examination.

With reference to the weight to be given the above testimony, particularly as establishing what constitutes a wholesale quantity, I quote the following from the case of *Jenkins Brothers* v. *United States*, 25 C. C. P. A. 90, T. D. 49093:

* * * While a statement that a given quantity is or is not a usual wholesale quantity might in some circumstances be regarded as some substantial evidence of the fact, such a statement can have no weight as a statement of fact when all of the facts upon which the statement is made are disclosed. It then becomes merely a conclusion of the witness, which can have no weight with the court in determining what is a usual wholesale quantity.

If the holding of the appellate court quoted above means anything, it means that under certain circumstances a statement by a properly qualified witness that a given quantity is or is not a wholesale quantity may be regarded as substantial evidence of such fact. The qualifications of the two witnesses whose testimony is hereinabove set out are the highest and cannot be questioned by anyone. Their testimony is no longer discredited by the lists of sales showing a state of facts different to those testified to with reference to a wholesale quantity, for the reason it has been shown that said sales are not competent evidence upon which to base a finding of wholesale quantity, and are no evidence of what constitutes a wholesale quantity. The testimony of these two witnesses, therefore, stands without contradiction as to what constitutes a wholesale quantity.

On the question of whether or not it is proper and legal for this court and the appellate court to consider statements contained in affidavits admitted in evidence in a reappraisement case, I quote the following from the case of *United States* v. *Wiener*, 15 Ct. Cust. Appls. 428:

We think that *there is but one question before us* which requires decision: *Is there any substantial evidence in the record to support the judgment of the court below?*

The testimony of Walter Peltzer was introduced in the form of an affidavit. He stated that, "by reason of his activities" for 15 years "as director of said corporation (the manufacturer and exporter of the involved merchandise) deponent is *in direct touch with the markets in all-silk erect pile velvets and that such velvets are not offered in the markets of Germany and that to the best of deponent's knowledge and belief there is not sold or freely offered for sale, either for home consumption in Germany or for export to the United States, a quality of velvet comparable to No. 8932 by other manufacturers in Germany*." [Italics not quoted.] He stated also that his company made the involved merchandise for, and sold it exclusively to, the appellee. This testimony was given by a man who had been a director of the exporting company for 15 years and who was in direct touch with the German market. Because of his interest and opportunity for observing and acquiring knowledge of the facts, he testified as one having such knowledge; and, while a portion of his testimony is "to the best of his knowledge and belief," the circumstances were such, probably, as to afford no more practical method of proving the facts in issue. *Surely this testimony, since it meets the issues squarely, should be considered as having substantial probative force. The question of its weight was for the consideration of the court below.* It accepted the testimony as having greater weight than that of witnesses who testified for the Government. *We have no power to reverse the judgment based upon this finding,* even if we were so disposed. *We hold,* therefore, *that there is some substantial evidence to support the findings of the court below,* and that the merchandise is dutiable at its United States value. [First and last italics mine.]

The weight of the evidence establishes that in the case of Eureka quality gauge glasses when sold in quantities of 1,000 feet or more, which, as we have found, is a wholesale quantity, the price at which the article is sold does not vary according to quantities sold, over and above that amount, and that in the case of Hercules quality gauge glasses when sold in quantities of 500 feet or more, which, as we have

found, is a wholesale quantity, the price at which the article is sold does not vary according to quantities sold, over and above that amount. It is therefore found unnecessary to determine what constitutes a *usual* wholesale quantity, and as authority for such finding cite the following from the case of *JenkinsrBothers* v. *United States, supra:*

Of course, where the price at which an article is sold does not vary according to quantities sold, no question of usual wholesale quantity can arise * * *.

In this case it is immaterial whether the amount be 1,000 feet or 1,000,000 feet in the case of Eureka, the price remains the same, and in the case of Hercules it is immaterial whether the quantity be 500 feet or 1,000,000 feet, the price remains the same.

There is no dispute between the respective parties as to the *per se* prices of the involved merchandise, the only disagreement between them being as to the amount of discounts which should be allowed from the list prices. Considering the special agent's report dated January 17, 1934, there is found the following with reference to applicable discounts:

DISCOUNTS: "Eureka"—10%10%10% (Long and short lengths)
 "Hercules"—75%10% " " " "
* * * * * * *

The above discounts have been in effect for the past three years.

As applicable at this point, I quote the following from the case of *United States* v. *Sabin*, 12 Ct. Cust. Appls. 520, T. D. 40731:

The price paid for the merchandise imported as shown by the invoice was some evidence of market value. *Lloyd Co.* v. *United States* (9 Ct. Cust. Appls., 280, 283; T. D. 38217); *United States* v. *Bloomingdale* (10 Ct. Cust. Appls., 149–154; T. D. 39400). In the absence of evidence to the contrary, it must be presumed that the sale price of the goods included the tax paid at the source. No evidence was submitted by the Government showing or tending to show that the invoice price did not include the sales tax or that the discounts claimed were not regularly allowed. We must consequently hold that the finding of Board 1 that such discounts were allowed and that the entered value was the market value of the importations was warranted by the facts disclosed to it by the record on appeal from the decision of the single general appraiser.

With reference to the discounts of 10 per centum, 10 per centum, and 10 per centum shown by the special agent as applicable to Eureka quality gauge glasses, Mr. Sobel explained this at the trial as follows:

Our invoices, the unit price is based on so much per dozen feet less the three 10 discounts. Abroad they have a printed price list on which they allow certain specific discounts. It is quite annoying to be obliged to figure the list price less the discounts. The method we have adopted for invoicing or rather the factory have adopted, is much simpler. They figure out the price per dozen feet, less the three 10's instead of using the list price; but the net result, 80 per cent off the foreign list price, is equivalent exactly to the prices indicated on our invoices.

This explanation of the discounts of 10 per centum, 10 per centum, and 10 per centum being the exact equivalent to the prices shown on the invoices in this case stands without contradiction.

After thoroughly and carefully considering all the evidence in the record as made, and in accordance with the remand to this court, I find from the weight of the evidence that the discounts applicable to the Hercules quality gauge glasses when sold in wholesale quantities of 500 feet or more are 75 per centum less 10 per centum, less 2½ per centum for cash, and that the discounts allowed and applicable to the Eureka quality gauge glasses when sold in wholesale quantities of 1,000 feet or more, are 80 per centum, less 2½ per centum for cash.

While I have specifically referred to and quoted from different parts of the record, I wish it distinctly understood that my findings and conclusions are not based upon a consideration of such evidence alone. I have not overlooked the other evidence in this record or failed to give careful consideration and proper weight to any of the evidence. I have particularly and carefully considered and weighed the records of sales above referred to, as well as all other evidence, in the light of the fact that this court and this court alone is the sole judge of the weight to be given thereto, the appellate court having no jurisdiction to weigh the evidence, its jurisdiction being confined exclusively to passing on any question of law involved (*United States* v. *Rodier*, 23 C. C. P. A. 336, T. D. 48196; *United States* v. *Kleberg*, 25 C. C. P. A. 142, T. D. 49256; *United States* v. *Allenby*, 20 C. C. P. A. 80, T. D. 45703, and *United States* v. *Kraft Phenix*, 26 C. C. P. A 224, C. A. D. 21, decided November 28, 1938) and, after having so reviewed, reconsidered and reweighed all of the evidence in this case as made, in the light of the decision of the appellate court remanding this case to us, and upon the weight of the evidence, I concur in each of the findings of fact and conclusions of law made by my associates.